# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

LISA BUTLER )
                   )
      Plaintiff, )
                   )
v. )     No. 3:11-cv-00427
                   )     Chief Judge Haynes
                   )
HARPETH VALLEY UTILITIES )
DISTRICT AND JOHN BROWN )
in his official and individual )
capacities )
                   )
      Defendants. )

## M E M O R A N D U M

Plaintiff, Lisa Butler, filed this action under 42 U.S.C. § 1981 and Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., against the Defendants: Harpeth Valley

Utilities District ("HVUD") and John Brown, HVUD's general manager. Brown is named in his

official and individual capacities.[1] Plaintiff's claims are for race discrimination in wages and a

racially hostile work environment that she alleges caused her constructive discharge.

In earlier proceedings, the Defendants filed a motion for summary judgment. (Docket Entry

No. 28), after which, Plaintiff filed a motion to compel information and a response to Defendants'

motion for summary judgment. The Court granted Plaintiff's motion to compel and denied the

Defendants' motion for summary judgment without prejudice to renew upon the conclusion of the

extended discovery period. (Docket Entry No. 41). Plaintiff later moved to strike evidentiary

---

[1]Under Title VII, there is not any individual liability. Wathen v. Gen. Elec. Co., 115 F.2d 400, 403-04 (6th Cir. 1997).

materials submitted by the Defendants' in a supplemental reply to Plaintiff' response. After reviewing the Plaintiff's motion papers and the Defendants' response, the Court granted Plaintiff's motion to strike given the Defendants' discovery response that there were not any similarly situated employees and their failure to supplement that discovery response prior to the close of discovery.

Before the Court is Defendants' renewed motion for summary judgment, (Docket Entry No. 44) contending, for Plaintiff's wages claim, in sum: (1) that Plaintiff cannot prove an adverse employment action; (2) that Plaintiff cannot show Defendants treated her in a less favorable manner than a similarly situated employee outside of her protected class; and (3) that the Defendants had legitimate, nondiscriminatory reasons for all actions affecting Plaintiff's employment. (Docket Entry No. 28-1). For Plaintiff's hostile work environment claim, Defendants assert: (1) that Plaintiff cannot prove she was subject to unwelcomed harassment; (2) that Plaintiff lacks proof of any harassment based upon her race; (3) that Plaintiff's proof lacks evidence of unreasonable interference with her work or an intimidating, hostile, or offensive work environment; and (4) that Plaintiff cannot establish employer liability. Id.

In her response, Plaintiff contends, in essence, that her proof shows: (1) that Plaintiff is a member of a protected class; (2) that Plaintiff suffered an adverse employment action because she received a lower rate of pay and smaller raises than the Defendants' other white managers; (3) that Defendants paid Plaintiff at the same pay classification as non-managerial hourly employees who lacked any supervisory responsibility; (4) that Plaintiff's resignation was a result of a racially hostile work environment; (5) that after Plaintiff's resignation, Defendants hired a white manager to replace Plaintiff; and (6) that the Defendants lack nondiscriminatory explanations for their treatment of Plaintiff. (Docket Entry No. 40).

For the reasons stated below, the Court concludes that Plaintiff's proof on her racial discrimination in wages claim is sufficient to support a judgment on her claims. The Court also concludes that material factual disputes exist on Plaintiff's hostile work environment claim that presents issues of credibility determinations that cannot be assessed on a motion for summary judgment.

**Review of the Record**[2]

The Defendant, HVUD, provides utilities services to residents in the Middle Tennessee area. (Docket Entry No. 31-1, Brown Deposition at 9-10). Defendant has an anti-discrimination employment policy:

> It is the policy of Harpeth Valley Utilities District to provide equal employment opportunities without regard to race, color, creed, sex, age, handicap, religion, national origin or marital status.
>
> This policy applies to all areas of employment including recruitment, hiring, training and development, promotion, transfer, termination, layofff, compensation and all other conditions and privileges of employment in accordance with applicable federal, state, and local laws, and with the basic dictates of human dignity.

(Docket Entry No. 30-2, Plaintiff Deposition Exhibit).[3]

John Brown is Defendant HVUD's general manager and Michelle Sadler is its office manager and administrative assistant to Brown. (Docket Entry 31-1, Brown Deposition at 8, 12-13). Sadler

---

[2]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 276 (1986). The Court concludes that there are material factual disputes. Thus, this section does not constitute findings of fact under Fed. R. Civ. P. 56(d).

[3]As discussed infra, Plaintiff states that this policy was not enacted until after she filed her EEOC charge. (Docket Entry No. 30-2).

processes employee insurance claims and prepares minutes for the board meetings. Id. at 12. In 2005, John Brown and Michelle Sadler created the position of Customer Service Manager, who would be responsible for managing the Defendants' customer service representatives. (Docket Entry No. 40-2 at ¶ 5).

### 1. Plaintiff's Wage Claim

In October 2005, John Brown and Michelle Sadler interviewed and hired Plaintiff, an African American, as HVUD's Customer Service Manager. (Docket Entry No. 31-1, Brown Deposition at 12). Plaintiff disputes whether Michelle Sadler was her supervisor, (Docket Entry No. 30-1, Plaintiff Deposition at 67), but as Customer Service Manager, Plaintiff supervised and trained five customer service representatives, managed incoming payments, and made daily deposits. (Docket Entry No. 30-1, Butler Deposition at 17). Among Plaintiff's supervisory duties were to hire, fire, discipline and evaluate customer service representatives. Id. At the time of her hiring, Plaintiff stated that Brown and Sadler described the customer service department as "suffering morale, problem employees and out of control." (Docket Entry No.30-2, Plaintiff's Resignation Letter).

Plaintiff was a salaried employee who did not receive overtime compensation. (Docket Entry No. 40-3 at ¶¶ 5-6), but when Plaintiff incurred compensatory time she was paid for that work. (Docket Entry No. 31-3, Sadler Deposition at 13). Plaintiff's pay increased each year, except in 2010, when Defendants did not give any raises to any employee. (Docket Entry No. 31-1, Brown Deposition at 61).

The Defendants employed a wage consultant, Robert Greene of Reward Systems, Inc., as well as the American Waterworks Association to determine the Defendants' employees' pay grades. (Docket Entry No. 40-2 at ¶ 37). These consultants evaluated each job position and recommended

a minimum, average and maximum pay rate for each job position. (Docket Entry No. 31-1, Brown Deposition at 56). Based upon the consultant's recommendations, the Defendants' board assigned each employee an employee classification and pay rate. Id. at 57. The Defendants' board assigned Plaintiff's position the pay grade of "H09," an hourly employee. The "H" in the designation "H09" stands for "hourly." Id. at 62. The employees in the "H09" category are hourly employees who are eligible for overtime compensation. Id. at 61. Defendants' pay records for all of the "H09" employees, reflect:

| Employee | Title | 2005 Rate | 2006 Rate | 2006 % Up | 2007 Rate | 2007 % Up | 2008 Rate | 2008 % Up | 2009 Rate | 2009 % Up |
|---|---|---|---|---|---|---|---|---|---|---|
| Plaintiff | Manager | $14.43 | $17.00 | 17.8% | $21.81 | 28.3% | 22.68 | 4.0% | $23.36 | 3.0% |
| Demarse, L | Billing Dept. Rep. | $19.04 | $20.18 | 6% | $21.18 | 5% | $22.03 | 4% | $22.70 | 3.1% |
| Derryberry, R | Construction Inspector | $17.37 | $18.24 | 5% | $19.45 | 6.7% | $20.45 | 5.1% | $21.17 | 3.6% |
| Donnelly, G | Construction Inspector | $17.48 | $18.35 | 5% | $19.45 | 6% | $20.45 | 5.2% | $21.17 | 3.6% |
| Gibson, J | Backhoe Operator | $14.00 | $17.00 | 21.4% | $18.50 | 8.9% | $20.19 | 9.2% | $20.96 | 3.9% |
| Hagewood, W | Backhoe Operator | $10.65 | $13.00 | 22.1% | $14.50 | 11.6% | $16.15 | 11.4% | $16.65 | 3.1% |
| Henson, J | Pump Sation Foreman/Electrician | $16.44 | $17.10 | 4% | $18.50 | 8.2% | $20.19 | 9.2% | $21.00 | 4.1% |
| Jones, J | Construction Inspector | $19.80 | $20.59 | 4% | $21.83 | 6.1% | $22.92 | 5% | $23.75 | 3.7% |
| Young, G | Backhoe Operator | $16.63 | $17.47 | 5.1% | $18.75 | 7.4% | $20.19 | 7.7% | $20.96 | 3.9% |

With an "H09" classification, Plaintiff was grouped with other employees who worked as "billing department representatives," "construction inspectors," "backhoe operators," or "pump station foremen/electricians." Unlike Plaintiff, these employees are not managers of any department, and do not supervise any employees. Id. at 61. Accordingly to the above chart, for Plaintiff's first two years, six "H09" employees had higher hourly wages than Plaintiff and thereafter only one "H09" employee's hourly rate exceeded Plaintiff's hourly rate. Each of those employees are outside of Plaintiff's protected class. Id.

Plaintiff's proof is that other employees who are "managers", are classified as "S4" and "S5" employees. Employees with class codes of S4" and "S5" receive a salary. Plaintiff contends that all white managers have a class code of "S" and are paid on a salary basis. Defendant, however, disputes Plaintiff's assertion and contends that there are managers outside of the "S4" and "S5" classification, including employees classified as "H06" through "H10." The Defendants' pay records for "S4" and "S5" employees reflect the following:

| Employee | Class Code | Title | 2005 Rate | 2006 Rate | 2006 % | 2007 Rate | 2007 % | 2008 Rate | 2008 % | 2009 Rate | 2009 % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Caruthers | S4 | Superintendent | $32.15 | $33.76 | 5% | $39.75 | 17.8% | $42.14 | 6% | $43.40 | 3% |
| Lyle, Jack | S4 | Staff Engineer | $35.91 | $36.81 | 2.5% | $38.28 | 4% | $39.81 | 4% | $41.00 | 3% |
| Sadler, M | S4 | Office Manager, Admin Asst/Gen Manager | $29.68 | $31.46 | 6% | $34.61 | 10.1% | $36.69 | 6% | $37.97 | 3.5% |
| Treanor, B | S4 | Plant Manager | $34.67 | $36.75 | 6% | $38.59 | 5% | $43.75 | 13.4% | $45.06 | 3% |
| Ursery, E | S4 | Waste Water Superintendent | $37.68 | $39.19 | 4% | $40.76 | 4% | $42.39 | 4% | $43.45 | 2.5% |
| Ursery, Jr. | S4 | Water Dist. Superintendent | $39.11 | $40.09 | 2.5% | n/a | n/a | n/a | n/a | n/a | n/a |

| Aslinger, T | S5 | Water Plant Superintendent | n/a | n/a | n/a | n/a | n/a | $29.81 | n/a | $30.56 | 2.6% |
| Currier, L | S5 | Engineer Support Services | $24.97 | $25.72 | 3% | $26.75 | 4% | $28.09 | 5% | $29.49 | 5% |
| Pendleton | S5 | Plant Manager | $22.14 | $23.47 | 6% | $32.5 | 38.5% | $33.80 | 4% | $34.81 | 3% |
| Walker, D | S5 | Construction Inspection Manager | $30.08 | $31.28 | 4% | $32.53 | 4% | $33.83 | 4% | $34.68 | 2.6% |

Plaintiff's rate of pay was $21.81 in 2007, $22.68 in 2008, and $23.36 in 2009. Plaintiff's rate of pay increased in rate of pay 4% in 2008 and 3% in 2009. The average rates of pay for "S" employees was $35.47 in 2007, $36.70 in 2008, and $37.82 in 2009. The average increase in rate of pay for the "S" employees was 5.8% in 2008 and 3.6% in 2009. The records reflect that Plaintiff's rate of pay in 2007, 2008, 2009 and 2010 was 62% less than the average rate of pay for employees categorized as "S4" and "S5."

## 2. Plaintiff's Supervisory Performance

Since Plaintiff's hiring in 2005, several employees in her department resigned. In May 2006, a customer service representative, Francheatta Howard, resigned from her employment. (Docket Entry No. 30-2, Howard's Letter). In her letter of resignation, Howard cited Plaintiff's hostile manner as her reason for resigning. Id. Howard's letter criticized Plaintiff's managerial style and cited Plaintiff's hostile treatment of the individuals in the customer service department. Id. In 2007, Julie Gibson, a former Harpeth Valley customer service employee, verbally complained to Michelle Sadler about Plaintiff's managerial style and poor treatment of the employees in the customer service department. (Docket Entry No. 31-3, Sadler Deposition at 20-21). In May 2010, Jeanetta Walsh, Tracy Campbell, Shannon Steele, and Lauren Simpson, all customer service representatives at

Harpeth Valley, filed formal complaints about the Plaintiff, detailing the negative work environment created by Plaintiff's poor treatment of employees in the department. (Docket Entry No. 30-2, Exhibit Letters). One customer service representative, Tatiana Smith, did not file a complaint against Plaintiff. As stated earlier, at the time of Plaintiff's hiring, the customer service department had "suffering morale, problem employees and [was] out of control." (Docket Entry No. 30-2, Plaintiff's Resignation Letter).

Based upon these complaints, on June 20, 2010, Brown, Sadler and two other supervisors met with Plaintiff to discuss the customer service representatives's complaints. (Docket Entry No. 31-1, Brown Deposition at 16). Plaintiff read each of the complaints and requested to meet with each customer service representative who complained. Id. Brown invited the employees to meet and discuss their complaints with Plaintiff. Id. After learning that the customer service representatives were hesitant to express their complaints in her presence, Plaintiff left the meeting. Id. at 17. Some employees, however, remained hesitant to speak in the presence of Tatiana Smith, a customer service representative and Plaintiff's friend. Id. Subsequently, Smith left the room. Id.

In a meeting with Brown, Jeanetta Walsh, Shannon Steele, Tracy Campbell, and Lauren Jones stated that Plaintiff would often yell at them and belittle them. Id. Jeanetta Walsh told Brown that "she had to ask permission to use the restroom, and sometimes that permission was not granted and she urinated on herself. She then broke out crying and said, here I am a grown woman having to raise my hand like a grade school child in order to use the restroom." Id. at 18. Lauren Simpson, the only African American customer service representative in the meeting, stated "that she felt like she was treated as dumb and not intelligent enough by [Plaintiff]." Id. at 19. Shannon Steele's complaint about Plaintiff was:

[A]bout having an upset stomach and telling [Plaintiff] about that. And as [Plaintiff] decided to go to lunch, she said, we'll talk about it afterwards. Shannon Steele was still at her desk and was not allowed to go to the restroom. At that point she – now, [Plaintiff] had come back from lunch at this point evidently, and Shannon still said she didn't make it to the restroom and threw up on the way to the restroom and on herself and was very embarrassed by that.

Id.

After Brown heard the customer service representatives relate their complaints, Plaintiff returned to the room. Id. at 20. Brown asked Plaintiff, "have you not ever heard of The Golden Rule of treat others as you want to be treated. If they are a bad employee fire them. If they are a good employee, it is our responsibility to take care of them." Id. Brown also told all the customer service representatives in the meeting that "you do not have to kiss [Plaintiff's] ass" and "I don't expect you to kiss my ass." Id. at 21. Brown testified that he used these remarks because the employees had concerns about losing their jobs because Plaintiff had a three strikes rule for firing her employees. Id.

Despite these complaints about Plaintiff, Brown told Plaintiff to fire any bad employee, but otherwise to treat her employees with respect. Id. at ¶ 24. Brown asked Plaintiff to create a plan to improve the morale of the customer service department. (Docket Entry No. 31-1, Brown's Deposition at 67). Plaintiff's pay was not changed after these complaints nor was Plaintiff demoted or terminated. (Docket Entry No. 31-1, Brown Deposition at 69, 79, 86). Brown testified that he did not have any plans to terminate Plaintiff, id., and believed an action plan could restore good morale to the customer service department and enable Plaintiff to be a good manager. Id. at 69.

### 4. Plaintiff's Hostile Work Environment Claim

Plaintiff, who was the only African American among Defendants' White managers, cites differences in her treatment. In her deposition, Plaintiff testified:

Q. . . . Tell me about not being given access to the company credit card.

A. There would be occasions, say, if I was going – you had special food days, or whatever, with my department, and if I had asked for the credit card to make the purchase at from whatever restaurant, I was told that I would need to use my own and I would be reimbursed.

Q. What kind of credit card was this?

A. I – I have no idea. I mean, I took it that it was a Visa of a MasterCard. And in addition to that card, there was a Staples card that I also did not have access to. It seemed all other employees had access to that, but I didn't. There was a time when I was going to purchase a printer and again I was told to make the purchase and I would be reimbursed.

. . .

Q. And what about this Visa or MasterCard?

A. Well, I'll tell you about the Visa or MasterCard. Again, when I had asked, it was like, 'Oh, there is not one. Just,' you know, 'use your credit card and you'll be reimbursed.' However, during later times, if Michelle went out to purchase, again, it was a credit card. And I figured that it was a company credit card because at one time she brought in a replacement vacuum for the office that she had said was for points on the credit car, on the – I think she said the Visa card.

(Docket Entry No. 30-1, Plaintiff Deposition at 29, 31).

The Defendant does not issue a company Visa of MasterCard credit card to its employees. (Docket Entry No. 31-1, Brown Deposition at 83). If Plaintiff made work-related purchases on her personal credit card, Plaintiff would seek reimbursement. (Docket Entry No. 30-1, Plaintiff Deposition at 29). Defendants have a Staples credit card that Plaintiff could use, but Plaintiff never requested the Staples card. (Docket Entry No. 31-3, Sadler Deposition at 51). Although some managers are provided company vehicles, Plaintiff was not entitled to a company automobile. (Docket Entry No. 31-1, Brown Deposition at 86).

As to Plaintiff's claim of lack of support and assistance from upper management as other

managers received, Plaintiff testified:

> A. Early on, I – **when I had staff meetings with the customer service reps, I would invite John to our meetings, kind of as a way of letting them know that we were one force and in trying to get the department turned around. I did not receive any – any reply or anything. Verbally, I had asked him about participating or coming to some of our departmental meetings, and he just, you know, kind of said, 'Well, yeah, I'll have to do that.' But it never happened.**

> Q. Other than John Brown not attending meetings, can you think of any other examples of not getting the support from management?

> A. You know, walking into the situation that I did with Customer Service in the condition that it was in, as I would convey my observation of what was going on with Customer Service and maybe some of the things that needed to be turned around, I got no help. I mean, the problem in discussing problem employees, there was – there was no guidance, there was no help. It was just kind of like, you know, 'Swim or sink. You're on your own.'

(Docket Entry No. 30-1, Plaintiff Deposition at 39) (emphasis added). Plaintiff testified that Brown

attended other departments' meetings and supported the other departments. Id. at 42.

Plaintiff resigned as Customer Service Manager on September 1, 2010. (Docket Entry No.

31-1, Brown Deposition at 66). At her deposition, Plaintiff testified that:

> Q. Now, what happened between August 5[th], 2010 and your resignation on September 1[st], 2010? What happened during that period?

> A. The environment just got to be unbearable.

> Q. Anything in particular?

> A. **Just the overall environment. I mean, it was obvious, once the EEOC papers were filed and the other situation, that is was a very hostile environment.**

> Q. What do you mean 'the other situation'? The June 21st meeting?

> A. Yes. Yes.

> Q. Okay. And what to do you mean by 'hostile environment'?

11

A. Oh, just nitpicky thing. One of the ladies, Linda Demaris, had located an error that I had made and she had brought it to my attention and told me that she was supposed to make me ware of any further mistake that she might find that I had made.

Q. Who is Linda?

A. She works in Billing, under Michelle Sadler.

. . .

Q. Any other specifics that you can recall as regarding the hostile environment?

A. Michelle had scheduled – we were in the process of having someone else do our lockbox, processing payments, and Michelle had sent an email – we were going to have some people to come in to explain to us, you know, what they had to offer. And rather than Michelle sending me an email, letting me know when the meeting was going to be and to be included, she sent the email to Tracy Campbell, letting her know when the meeting was going to be and to participate in the meeting. So I, in turn – and Michelle sent me a copy of that email. So I, in turn, emailed Michelle back, saying that I would like to be in on that meeting.

Q. Did Tracy deal with the lockboxes?

A. She did deal with the lockboxes, as did other employees within the department.

. . .

Q. Or I should say, Michelle copied you on the email that was sent to Tracy Campbell regarding companies coming in to give a presentation about the lockbox?

A. Correct.

Q. Anything else specifically that you can recall?

A. No. Not off the top of my head.

(Docket Entry No. 30-1, Plaintiff Deposition at 87-89) (emphasis added).

Plaintiff sent the following letter of resignation to John Brown:

I am resigning from my job as Customer Service Manager with HVUD effective immediately. . . .

**When I originally interviewed with you and Michelle Sadler about the manager position and was told about the suffering morale, problem employees and out of control department, I thought of those challenges as opportunities. Within month of being hired, I knew I had made a mistake accepting employment with HVUD after realizing there were too many factors working against me.**

I became increasingly frustrated, disappointed, hurt and saddened by having **legitimate concerns I raised either ignored or dismissed. That definitely reflected I was not treated as an equal. Part of the fault is mine for initially believing I had the support of management.** Not having that management support hindered my effectiveness with the Reps.? I suppose I was naive enough to believe if I worked hard to identify the problems and make positive changes, I would win the respect of the Reps. And management. How disillusioned I was. It was definitely a no win situation for me.

**The racial injustices are alive and thriving at HVUD and the company's culture condones it. It's appalling that HVUD didn't have any policies in place to address discrimination until after I filed my complaint with EEOC. What does that say about the company? I suppose the same thing it says that HVUD was not racially integrated until recent years.**

**I also want to clear up any notions you may have that I filed my EEOC complaint after your "whites only" meeting on June 21, 2010.** I actually retained my attorney on June 4, 2010 and immediately began the process. I had simply had enough!

The email I sent to you on December 15, 2006 is as relevant today as it was then. At that time **I brought to your attention Tracy's mutiny attempt against me in order to run me off and get the manager job. I found it amusing in the "whites only" meeting you were all moved to tears by her award winning or should I say job-winning performance; I was not. I know for years what she was contriving behind my back. I've hear her brag about knowing how to manipulate her parents, there's no limit to her manipulation.** You all fell for it!

You may also want to refer to my email on January 23, 2007 inviting you to speak at one of our department meetings. You may also recall several other times I asked to attend our meetings; to no avail. After the meeting on June 21, 2010, suddenly other members of management needed to be in attendance before I called a meeting with the Representatives. However, that's the standard mode of operation at HVUD, reactive instead of proactive.

I also want to point out just as there was issues brought out in the June 21st meeting that Michelle had not made management aware of, I assure you there are plenty of matters that your source of information (Michelle) was not telling you. But I guess

13

that's the danger of relying on others to disseminate information to you instead of being around to observe what's going on for yourself.

(Docket Entry No. 30-2, Plaintiff's Resignation Letter) (emphasis added).

## B. Conclusions of Law

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56. "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee notes. Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment `shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

Id. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational

14

trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electrical Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex, 477 U.S. at 326. Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989); see also Routman, 873 F.2d at 971.

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Celotex Court:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

477 U.S. at 323 (emphasis deleted).

As the Sixth Circuit explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239 n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874

F.2d 351, 353 (6th Cir. 1989) (quoting Celotex, 477 U.S. at 322 and Rule 56(e)).

Once the moving party meets its initial burden, the Sixth Circuit warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion. . . . [and] must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby, 477 U.S. at 251, 255).  Moreover, the Sixth Circuit explained that

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.'  Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (citations omitted); see also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790 (6th Cir. 1990) (quoting Liberty Lobby, 477 U.S. at 151-52) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.").

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.
> * * *
> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.  If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably

favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citations omitted and emphasis added).

It is likewise true that

[I]n ruling on motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Sixth Circuit stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) (citation omitted).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of."

Of course, the designated portions of the record must be presented with enough

specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (citation omitted). In this district, the parties must provide specific references to the proof upon which they rely. See Local Rule 56.01(c) (requiring each party to provide a statement of undisputed facts to which the opposing party must respond).

In Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989), the Sixth Circuit discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6. As on federal directed verdict motions, the 'scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Id. at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) whether the moving party "clearly and convincingly" established the absence of material facts; (2) if so, whether the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense; (3) if factual support is presented by the nonmoving party, whether those facts are sufficiently plausible to support a jury verdict or judgment under the applicable law; and (4) whether there are any genuine factual issues with respect to those material facts under the governing law?

### 1. Racial Discrimination

Title VII of the Civil Rights Act of 1964, provides:

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

Absent direct evidence of discrimination, Title VII claims are evaluated in a three-part, burden-shifting analysis: (1) the plaintiff must establish a prima facie case of discrimination; (2) the employer must articulate some legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff must prove that the stated reason was pretextual. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); accord Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). The burden of persuasion remains with the plaintiff at all times. Canitia v. Yellow Freight Sys., Inc., 903 F.2d 1064, 1066 (6th Cir.1990).

For her disparate treatment claims under Title VII, Plaintiff's prima facie showing of disparate treatment requires proof that:

(1) Plaintiff is member of a protected class;

(2) Plaintiff suffered an adverse employment action;

(3) Plaintiff was qualified for the position;

(4) Plaintiff was treated differently than similarly-situated employees outside of the protected class for the same or similar conduct.

Abeita v. Transamerica Mailings, Inc., 159 F.3d 246, 252 (6th Cir.1998). See also McDonnell Douglas Corp., 411 U.S. at 802.

To establish a prima facie showing of wage discrimination based on race, "plaintiff must

show membership in a protective class . . . and that [they] were performing work substantially equal to that of white employees who were compensated at a higher rate then they were." Medrano v. MCDR, Inc., 366 F. Supp. 2d 625 (W.D. Tenn. 2005) (citing Anderson v. Zubieta, 108 F.3d 329, 338 (D.C. Cir. 1999)). Here, Plaintiff is a member of a protected class and although a manager, Plaintiff was classified as an hourly employee whereas other managers were not. In addition, hourly employees without supervisory duties were paid higher compensation than Plaintiff.

Under Sixth Circuit law, "[a]n adverse employment action has been defined as 'a materially adverse change in the terms and conditions of [a plaintiff's] employment.'" Spees v. James Marine, Inc., 617 F.3d 380, 391 (6th Cir. 2010) (quoting White v. Burlington N.& & Santa Fe Ry. Co., 364 F.3d 789, 795 (6th Cir. 2004)). "Adverse employment actions are typically marked by a 'significant change in employment status,' including 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, **or a decision causing a significant change in benefits**.'" Spees, 617 F.3d at 391 (quoting White, 364 F.3d at 798) (emphasis added). Yet, "[a] 'bruised ego' or a 'mere inconvenience or an alteration of job responsibilities' is not sufficient to constitute an adverse employment action.'" Spees, 617 F.3d at 391 (quoting White, 364 F.3d at 797). Here, the Court concludes that the payment of lower wages to Plaintiff and Plaintiff's proof on constructive discharge, if true, are adverse employment actions.

As to any disparate treatment claim, under Title VII, Plaintiff must show that the comparable employees are "similarly situated in all respects." Hollins v. Atlantic Co., Inc., 188 F.3d 652, 659 (6th Cir.1999) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). "'Precise equivalence . . . between employees' is not required.'" Hollins, 188 F.3d at 659 (quoting Harrison, 80 F.3d at 1115). Thus, the similarly-situated employees with whom Plaintiff seeks to compare her

treatment must have "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell, 964 F.2d at 583.

In Ercegovich v. Goodyear Tire and Rubber Co., 154 F.3d 344 (6th Cir. 1998) the Sixth Circuit warned against reading Mitchell so narrowly as to require a plaintiff to be identically situated to the non-protected employee in every single aspect of their employment. Id. at 353. For with such a narrow reading, "a plaintiff whose job responsibilities are unique to his or her position will never successfully establish a prima facie case (absent direct evidence of discrimination)." Id. The employee and his or her similarly situated counterparts only need be similar in "all of the relevant aspects." Id. at 352.

As applied here, Plaintiff, an African American woman, is a member of a protected class. Plaintiff was qualified for her position as Customer Service Manager. Plaintiff describes the Defendants' different treatment of other white managers by her hourly wage; a lower rate of pay and smaller increases in pay in comparison to Defendants' other white managers. (Docket Entry No. 40-1 at 6). The classifying of Plaintiff, a manager, at the same level as an hourly employee, who was without actual authority to hire, fire and discipline is also disparate treatment in compensation.

As to whether, "the defendant articulate[d] some legitimate, nondiscriminatory reasons" for its employment decisions, McDonnell Douglas, 411 U.S. at 802, "the defendant must clearly set forth, through introduction of admissible evidence, reasons for" its actions. Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 255 (1981). The defendant "need not persuade the [trier of fact] that it was actually motivated by the proffered reasons," Id. at 254, but "only produce admissible

evidence which would allow the trier of fact to rationally conclude that the employment decision was not motivated by discriminatory animus." Id. at 257. The defendant's burden is, thus, one of production; not persuasion. Id. at 254-55. Although the burden of production shifts to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [her] remains at all times with the plaintiff." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993). Yet, Hicks does not apply to a motion for summary judgment. As explained in Griffin v. Finkbeiner, 689 F.3d 584, 594 (6th Cir. 2012):

> **The question in Hicks was whether a showing of pretext 'mandates a finding for the plaintiff,' which is a different question from what a plaintiff has to show to survive summary judgment.** The ultimate question of fact in a Title VII race-discrimination case is, of course, whether the defendant discriminated against the plaintiff on the basis of race. **Racial animus is not the only inference that can be drawn from evidence that the proffered reason for an adverse employment action was pretext. Evidence that the employer's proffered reason for the termination was not the actual reason thus does not mandate a finding for the employee, but is enough to survive summary judgment. The jury can decide whether racial animus was the actual reason for Daughtrey's termination."** (citations omitted).

Here, the Court concludes that a jury could determine that the independent study is a legitimate business reason to explain Plaintiff's wage claim, but the fact that pay was based upon a consulting firm's recommendation does not relieve the Defendants of their Title VII obligations to avoid racially disparate wage practices nor preclude a jury finding that the other evidence of disparate treatment of Plaintiff from other managers was racially motivated.

Once the Defendant produces a legitimate nondiscriminatory explanation, as here, Plaintiff must show that the employer's proffered reason is pretextual. Hicks, 509 U.S. at 507-08. "It is not enough, in other words, to disbelieve the employer; the factfinder must **believe** the plaintiff's explanation of intentional discrimination." Id. at 519 (emphasis in original), yet as the Sixth Circuit

observed, "[t]he question in <u>Hicks</u> was whether a showing of pretext 'mandates a finding for the plaintiff, 504 U. S. At 504, which is a different question from what a plaintiff has to show to survive summary judgment." <u>Griffin</u>, 689 F.3d at 594. Moreover, "[a] plaintiff does not need to introduce additional evidence of discrimination to prevail on the merits." <u>Kline v. Tennessee Valley Auth.</u>, 128 F.3d 337, 347 (6th Cir.1997). The factfinder may find discrimination once a <u>prima facie</u> showing is established with the disbelief of the employer's proffered reasons for the adverse employment action. <u>Id.</u> To challenge the employer's explanation for an adverse employment action, Plaintiff must prove by a preponderance of the evidence, "either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action." <u>Kocsis v. Multi-Care Mgmt., Inc.</u>, 97 F.3d 876, 883 (6th Cir.1993). "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." <u>Ondricko v. MGM Grand Detroit, LLC</u>, 689 F.3d 642, 651 (6th Cir. 2012) (citations to Supreme Court and Sixth Circuit decisions omitted).

The Court concludes that a trier of fact could find that Defendants' stated non-discriminatory reason in classifying Plaintiff as an "H09" employee is not legitimate because Plaintiff was a manager with supervisory duties to hire, fire and discipline and unlike Defendants' other white managers with such authority, Plaintiff is classified as hourly employee. Defendants contend that they are entitled to the same-actor inference on Plaintiff's claims. (Docket Entry No. 28-1 at 21). To be sure, "[i]t has been recognized in the Sixth Circuit that if the same person who hires an individual also makes an unfavorable employment decision, a strong inference is created that discrimination did not play a role in the decision." <u>Id.</u> (citing <u>Buharmaster v. Overnite Transportation Co.</u>, 61 F.3d 461, 464 (6th Cir. 1995)). Yet, the Court concludes that although the Defendants are entitled to this

inference, the disparate treatment of Plaintiff in salary from other managers creates a competing adverse inference that cannot be resolved on a motion for summary judgment..

Analyzing Plaintiff's claim disparate wage claim, the Court concludes that Plaintiff's proof of disparate wages is sufficient to support a judgment and material factual disputes exist on whether the Defendants had a legitimate business reason for Plaintiff's disparte classification and salary when compared to other managers. Thus, Defendants' motion for summary judgment on Plaintiff's racially discriminatory wage claim should be denied.

## 2. Hostile Work Environment

To establish a hostile work environment, Plaintiff must show: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment had the effect of altering the terms and conditions of her employment by creating a hostile work environment; and (5) Defendants failed to take reasonable care to prevent and correct any harassing behavior. Russell v. Univ. of Toledo, 537 F.3d 596, 608 (6th Cir. 2008). A court should consider all the circumstances rather than dividing and categorizing the reported incidents, but "only harassment based on the plaintiff's race may be considered." Williams v. CSX Transp. Co., Inc., 643 F.3d 502, 522 (6th Cir. 2011) (emphasis omitted).

In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court clarified that "[h]ostile environment claims are different in kind from discrete acts" such as "termination, failure to promote, denial of transfer, or refusal to hire," which are "easy to identify." Id. at 103, 114. In "direct contrast," harassment involves repeated conduct that occurs over a period of time; "a single act of harassment may not be actionable on its own." Id. at 102-03. A time-barred discrete act is not actionable as a hostile work environment claim even if the act is related to an act

alleged in timely filed charges. Id. at 113; see also Burus v. Wellpoint Cos., Inc., 434 F. App'x 475 (6th Cir. 2011) (per curiam). Yet "[t]he existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim."Morgan, 536 U.S. at 113. The proper inquiry is "(1) whether a reasonable person would find the environment objectively hostile, and (2) whether the plaintiff subjectively found the conduct 'severe or pervasive.'" Williams v. Gen. Motors Corp., 187 F.3d 553, 568 (6th Cir. 1999).

Defendants contend that Plaintiff lacks direct evidence of a racially hostile work environment. (Docket Entry No. 28-1 at 23). Moreover, Defendants assert that "[e]ven if the things alleged by Plaintiff occurred, there is no evidence that they were motivated by racial animus. They certainly do not rise to the level of being severe and pervasive." Id. at 24. Defendants also cite the lack of company Visa of MasterCard credit cards and note that if Plaintiff had requested the Staples card, her request would have been granted. Id. at 11. Moreover, Defendants assert that all employees made purchases on their personal credit and then received reimbursement. Id. Defendants assert that very few managers had company vehicles and that Plaintiff admitted that she had knowledge that she was not entitled to a company vehicle. Id. at 14. Defendants contend that these circumstances do not suggest a materially negative effect on the terms and conditions of Plaintiff's employment.

Yet, the proof of racially disparate treatment of Plaintiff as to her compensation, Plaintiff's proof about the lack of managerial support, Plaintiff's status as the only African American manager in a troubled department, collectively present competing adverse inferences. The evidence that

Plaintiff's employees were unable to remain in the same room with Plaintiff to discuss their complaints reflects a hostile work environment. On the one hand, the employees had intense criticism of Plaintiff and if true, those criticisms would provide a non-racial explanation about Plaintiff's constructive discharge claim. Yet, Brown did not take any specific adverse actions against Plaintiff beyond broad statements applicable to Plaintiff and the employees and a directive for Plaintiff to develop a plan to increase the morale of her department. Giving all favorable inferences to Plaintiff, as required on this motion for summary judgment, Brown's response casts doubt about the credibility of these employees', particularly, given the troubled nature of this department prior to Plaintiff's hiring.

Plaintiff was the Defendants' only African American manager, and perceived these employees' comments as racially motivated. Prior to her arrival, Plaintiff was advised that the customer service department suffered from low morale and "out of control employees." To be sure, Plaintiff's employees complained about Plaintiff's managerial style and their complaints, if true, could raise legitimate management concerns, but Brown did not consider the employees' statements sufficient to sanction Plaintiff by demotion or wage loss or other discipline. There is not any evidence of obvious racial remarks, but the lack of obvious proof of racism is not controlling.[4] Plaintiff cites HVUD's only recent hiring of African Americans, the lack of any non-discriminatory policy until Plaintiff filed her EEOC charge, the "whites only" meeting where the complaining employees would not talk to Plaintiff or in her presence, the lack of Brown's support with

---

[4]"Indeed, we have held that '[c]ircumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff.'" Griffin, 689 F.3d at 595 (quoting Ercegovich, 154 F.3d at 356)

troublesome employees, and the additional hostility toward Plaintiff after she filed her claims of race discrimination with the EEOC.

In this factual context, when coupled with Plaintiff's proof of Defendants' racial discrimination in her wages, the Court concludes that Plaintiff's proof of a racially hostile work environment presents evidence that turns on the credibility of witnesses and such issues cannot be decided on a motion for summary judgment. Liberty Lobby, 477 U.S. at 255; Adams v. Metiva, 31 F.3d 375, 382 (6th Cir. 1994) ("the district court erred in finding plaintiff's and the two witnesses' accounts implausible and in granting summary judgment where issues of credibility were determinative of the case at hand"). Because the credibility of witnesses cannot be assessed on a motion for summary judgment, the Court concludes that Defendants' motion for summary judgment on Plaintiff's claim of hostile work environment should be denied.

## C. Conclusion

For these reasons, the Defendants' motion for summary judgment (Docket Entry No. 35) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _6th_ day of September, 2013.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court